| | | | | |
|---|---|---|---|---|
| ____ Day Extension (Agreed) | N/A | N/A | | |
| Second Reviewing Justice: | | | | |
| ____ Day Extension (Absence) | N/A | N/A | | |
| ____ Day Extension (Agreed) | N/A | N/A | | |
| Proposed Issue Date: | N/A | N/A | | |
| 1st Delayed Issue Date: | N/A | N/A | | |
| 2nd Delayed Issue Date: | N/A | N/A | | |
| 3rd Delayed Issue Date: | N/A | N/A | | |
| 4th Delayed Issue Date: | N/A | N/A | | |

**J.M.K. 6, INC., Appellant**

v.

**GREGG & GREGG, P.C. and Dick H. Gregg, Jr., Appellees.**

No. 14–04–00849–CV.

Court of Appeals of Texas, Houston (14th Dist.).

March 28, 2006.

Earl Landers Vickery, Austin, for appellants.

Alton C. Todd, Friendswood, James C. Marrow, Matthew T. McCracken, Houston, D. Woodard Glenn, Dallas, for appellees.

Panel consists of Justices FOWLER, EDELMAN, and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

In this appeal, we decide (1) whether the *Hughes* tolling rule applies to certain third-party claims; (2) whether these third-party claims are "cross claims" subject to section 16.069 of the Texas Civil Practice and Remedies Code; and (3) whether the trial court erred in dismissing the third-party claims for contribution and indemnity. Because the *Hughes* rule does not extend the time for a client to file suit against his attorney if the attorney did not provide legal services in the prosecution or defense of a claim, we answer the first question in the negative. We further conclude that, although a third-party claim is not a "cross claim" within the scope of TEX. CIV. PRAC. & REM.CODE ANN. § 16.069, the trial court erred in dismissing appellant's third-party claims for contribution and indemnity. We therefore affirm in part, reverse in part, and remand.

### I. PROCEDURAL BACKGROUND

On May 20, 2003, BMW Partners, L.L.C. ("BMW") and Tyson & Associates, L.L.C. ("Tyson") sued appellant J.M.K. 6, Inc. ("J.M.K.") and Chicago Title for fraud in connection with a real estate transac-

tion.[1] On September 2, 2003, J.M.K. joined its attorney Dick H. Gregg, Jr. and his firm, Gregg & Gregg, P.C. (collectively, "Gregg") as third-party defendants, asserting claims for negligence, negligent misrepresentation, promissory estoppel, deceptive trade practices, contribution, and indemnity. Gregg first filed a motion for summary judgment asserting the statute of limitations and then filed a separate summary judgment motion asserting several grounds against J.M.K.'s claims for contribution and indemnity. The trial court granted both motions, dismissed J.M.K.'s third-party claims, and granted a severance, making the judgments final and appealable.

## II. FACTUAL BACKGROUND

Jerome Karam was in the business of acquiring apartment complexes, converting them to condominiums, and selling the condominium units to third parties. Karam hired Gregg to incorporate the legal entities that would own the condominiums. The corporation would then hire Gregg to convert the apartments to the condominium form of ownership. Gregg and J.M.K. dispute the scope of Gregg's duties beyond this point. Gregg contends that his duties were limited to performing certain specified tasks relating to the condominium conversion. In contrast, J.M.K. asserts that Gregg also had the broader duty to ensure that the condominiums were ready for sale. The parties agree that Gregg incorporated J.M.K., represented it in connection with the conversion of the complex at issue, Bryn Mawr, and prepared and filed the condominium declaration on August 9, 2000, in Harris County.

BMW and Tyson agreed to purchase several condominiums in the Bryn Mawr project. J.M.K. claims that, prior to closing the sale, Gregg informed J.M.K. it had complied with all legal requirements necessary to convert the Bryn Mawr complex to condominiums and that the units were ready to be sold. J.M.K. also alleges that, prior to the closing date, Gregg and Karam, as J.M.K.'s president, had a conference call with an agent of BMW and Tyson. During that call, Gregg allegedly represented to BMW and Tyson that all legal requirements necessary to convert the complex to condominiums were complete, and that the closing could proceed. This sale was completed in August 2000.

Almost a year later, on June 25, 2001, Karam attended a meeting of the City of Pasadena Planning and Zoning Commission to discuss Southmore, another of Karam's developments. According to the minutes of that meeting, the Commission found that the Southmore project failed to satisfy nineteen of the City's building code requirements.[2] Karam responded that he was willing to comply, but was not prepared to address the issues. The minutes reflect the following:

> He [Karam] will do whatever it takes to comply with the requirements, but he is not prepared to address these issues. His attorney had advised him this project was in compliance with the state condominium conversion act and the

---

1. The claims against Chicago Title Insurance Company are not before this court.

2. These included insufficient space within and between the buildings; inadequate space between condominium units and roads, storage buildings, dumpsters, and property boundaries; inadequate open space as compared to roadways; inadequately sized patios, parking lots, private drives, and access streets; and nonconforming curbs and gutters. The Commission also informed Karam that he was required to show or designate typical elevations and floor plans, the direction the units would face, the size of private patios, the minimum illumination, and the existence or location of privacy fences.

City of Pasadena adheres to that, so he is not prepared to answer questions about these issues.

In response to further questioning by the commission, the minutes reflect Karam:

Stated again that his attorney had checked with the attorney for City of Pasadena regarding compliance. Commissioner Fox said what probably happened was if this were the typical apartment project with green space and such, it would have complied which is what the city attorney probably thought. However, the way this building is constructed and the property is developed, it presents a different situation. He stated he's not sure how some of these issues can be resolved. Had it come to this board prior to the deeds being recorded, it could have been addressed one issue at a time ... Mr. Karam said if he could work with someone who will explain what the main issues are, this project is priority to him and he will focus on getting the situation resolved ... Mr. Karam commented that he wants to comply with the rules and regulations and apologized that he was unaware of all these requirements prior to beginning the project ... Mr. Karam asked if they have authority to grant the variances, to which he was answered variances are granted by city council, but only after a recommendation is made by the commission ... Commissioner Thomas made a motion to disapprove the preliminary review of Southmore Townhomes conversion from apartment/townhomes to condominiums, seconded by Commissioner Mills. The motion carried unanimously.

The parties do not dispute that Karam understood the issues raised with respect to the Southmore property also affected the Bryn Mawr property. After the June 25th meeting, J.M.K. spent several months attempting to persuade the City to recognize the Bryn Mawr conversion. Karam later testified that "[t]he City of Pasadena has never flatly refused to recognize the possibility of an effective conversion of the apartments to condominiums," but in December 2001, "the Commissioners definitively informed us that, in order for the City to recognize the conversion, [J.M.K.] would have to spend approximately $2 million on various improvements and modifications. Because of the financial magnitude of the City's requirements, this was not a viable solution."

In the underlying suit, both BMW and Tyson alleged that J.M.K. and Chicago Title made false representations regarding the truth and accuracy of various documents, including, but not limited to, false representations in the settlement statement, the contract of sale, and the warranty deed. According to BMW and Tyson, the settlement statements and other documents had been prepared by or at the request of Chicago Title, and reflected that the purchasers were acquiring fee simple title to "condominium units." BMW and Tyson alleged that the units were not actually condominiums, because the conversion of the property took place without prior approval from the City and in contravention of the City's subdivision ordinances. Although J.M.K. apparently abandoned its efforts to change the City's decision in December 2001, BMW and Tyson allegedly purchased units as late as April of 2002 without the knowledge that the City had not recognized the condominium conversion.

Suit was filed in May 2003, but J.M.K. was never served with citation. In July 2003, J.M.K.'s trial counsel agreed to voluntarily answer the petition. The petition was forwarded to J.M.K.'s counsel on July 10, 2003. On September 2, 2003, J.M.K. filed its original answer, a cross claim

against co-defendant Chicago Title Insurance Co., and a third-party petition against Dick Gregg, Jr. and his firm.[3]

Gregg filed an answer asserting that the claims were time-barred, and that Gregg had nothing to do with the drafting or handling of the documents at issue. Gregg successfully moved for summary judgment on the affirmative defense that the two-year statute of limitations barred J.M.K.'s claims. After J.M.K. filed a motion for new trial asserting that the statute of limitations could not have possibly run as to its claim for contribution and indemnity, Gregg filed a second motion for summary judgment conceding that its limitations defense did not apply to the contribution and indemnity claims and asserting that these claims failed as a matter of law on several other grounds. The trial court granted Gregg's second summary judgment motion and severed the third-party claims to make its judgment final. This appeal ensued.

### III. ISSUES PRESENTED

On appeal, J.M.K. asserts that (1) the trial court erred in granting the second motion for summary judgment as to its contribution and indemnity claims; (2) the two-year statute of limitations does not bar its third-party claims because the claims are "cross claims" under section 16.069 of the Texas Civil Practice and Remedies Code; and (3) the *Hughes* tolling rule applies, therefore, limitations did not begin to run until December 2001. In evaluating these issues, we first determine the accrual date for J.M.K.'s claims against Gregg for negligence, negligent misrepresentation, promissory estoppel, and deceptive trade practices (hereinafter collectively referred to as "Legal Malpractice Claims"). If these claims accrued more than two years

before J.M.K. sued Gregg, we need not address J.M.K.'s second and third issues.

### IV. STANDARD OF REVIEW

Gregg did not state in either motion for summary judgment whether it was seeking traditional summary judgment or no-evidence summary judgment. *Compare* TEX.R. CIV. P. 166a(c), *with* TEX.R. CIV. P. 166a(i). The two forms of summary judgment are distinct and invoke different standards of review. *Lavaca Bay Autoworld, L.L.C. v. Marshall Pontiac Buick Oldsmobile,* 103 S.W.3d 650, 653 (Tex. App.-Corpus Christi 2003, no pet.). Because J.M.K. received no notice that Gregg sought no-evidence summary judgments, we presume Gregg sought traditional summary judgments. *Adams v. Reynolds Tile and Flooring, Inc.,* 120 S.W.3d 417, 419–20 (Tex. App.-Houston [14th Dist.] 2003, no pet.) (where the summary-judgment motion does not unambiguously state it is filed under Rule 166a(i) and does not strictly comply with the requirements of that rule, it will be construed as a traditional summary-judgment motion).

In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 157 (Tex.2004). Under Texas Rule of Civil Procedure 166a(c), the party moving for traditional summary judgment bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.

---

**3.** BMW and Tyson agreed to consider the answer timely filed.

*Id.* We affirm the summary judgment if any theory presented to the trial court is sufficient to sustain the judgment. *Id.* Traditional summary judgment for a defendant is proper only when the defendant negates at least one element of each of the plaintiff's theories of recovery, or pleads and conclusively establishes each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex. 1997); *Castillo v. Westwood Furniture, Inc.,* 25 S.W.3d 858, 860 (Tex.App.-Houston [14th Dist.] 2000, no pet.).

## V. ANALYSIS

### A. Accrual of the Legal Malpractice Claims

The parties do not dispute that J.M.K.'s Legal Malpractice Claims are subject to a two-year limitations period. Generally, a legal malpractice claim accrues when the client sustains a legal injury or, in cases governed by the discovery rule, when the client discovers or should have discovered the facts establishing the elements of its claim. *Hughes v. Mahaney & Higgins,* 821 S.W.2d 154, 156 (Tex.1991). Gregg therefore had the burden to prove that J.M.K. knew or should have known the facts establishing its claims more than two years before the third-party petition was filed. *See Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 517 (Tex.1988) (limitations is an affirmative defense that must be proven by the asserting party).

Gregg contends that the Legal Malpractice Claims accrued on August 9, 2000—the date that the Declaration and Master Plat for Bryn Mawr Condominiums was filed. Gregg also claims that Karam was aware of the problems with the Bryn Mawr project on or before the June 25, 2001 meeting of the Pasadena Planning and Zoning Commission. J.M.K. does not dispute that the June 25, 2001 meeting included "a discussion of the City's position

that the property had not been effectively converted from apartments to condominiums." Despite the continued efforts of J.M.K. and its attorneys, including Gregg, to persuade the City to recognize the condominium conversion, the undisputed evidence shows that the City of Pasadena's Planning and Zoning Commission unanimously passed a motion on June 25, 2001, disapproving the type of condominium conversion at issue in the Bryn Mawr project. No summary-judgment evidence shows that the City voted or took other official action regarding the Bryn Mawr project after June 25, 2001.

The time for accrual of a claim is a question of law. *Moreno v. Sterling Drug, Inc.,* 787 S.W.2d 348, 351 (Tex.1990). Where applicable, the discovery rule defers the accrual of a claim until the plaintiff knew or, in the exercise of reasonable diligence, should have known of the wrongfully caused injury. *Wagner & Brown, Ltd. v. Horwood,* 58 S.W.3d 732, 735 (Tex. 2001). The plaintiff need not know the specific nature of each wrongful act that may have caused the injury for his claim to accrue under the discovery rule. *Id.* Rather, it accrues when the plaintiff discovers or, in the exercise of reasonable diligence, should discover the "nature of his injury." *Childs v. Haussecker,* 974 S.W.2d 31, 40 (Tex.1998). Thus, the discovery rule only defers accrual of a claim until the plaintiff discovers, or should have discovered through reasonable diligence, the injury and that it was likely caused by the wrongful acts of another. *Id.*

By June 25, 2001, J.M.K. was aware that Gregg had allegedly failed to take all steps necessary for the City of Pasadena to recognize the Bryn Mawr conversion. J.M.K. does not rest its claim for liability on any acts or omissions by Gregg subsequent to that date; however, J.M.K. claims that at

a meeting in December 2001, "the Commissioners definitively informed [J.M.K.] that, in order for the City to recognize the conversion, [J.M.K.] would have to spend approximately $2 million on various improvements and modifications." Thus, J.M.K. argues that the Legal Malpractice Claims accrued in December 2001, when J.M.K. learned the cost of the modifications requested by the City. J.M.K. does not deny knowing that it had potential claims on June 25, 2001; rather, J.M.K.'s president "continued to believe that the Commission would ultimately recognize the effectiveness of the conversion, and continued to assert this position before the Commission." When J.M.K. ultimately learned the cost of the modifications necessary to address all of the City's concerns, J.M.K. determined that compliance "was not a viable solution." There is no indication in the record that J.M.K. continued its efforts to persuade the Commission to reverse its earlier decision and recognize the conversion after this time. J.M.K. therefore argues that the statute of limitations should have been tolled until December 2001.

■ The discovery rule tolls the statute of limitations only until such time as the plaintiff, in the exercise of reasonable diligence, should have discovered the "nature of his injury." *Childs*, 974 S.W.2d at 40. This is an objective inquiry into whether the plaintiff should have discovered the injury, and not an inquiry into the plaintiff's subjective belief as to whether the injury could be remedied affordably. Regardless of J.M.K.'s subjective belief that the injury could be successfully remedied either by persuading the Commission to reverse its earlier ruling or by making the

modifications the Commission required, J.M.K. was aware of the alleged injury on June 25, 2001. Even if J.M.K. could not have known the cost of repairs before December 2001, this information did not constitute knowledge of an additional wrong by Gregg, but pertained only to the cost to remedy alleged prior omissions. It was not necessary that J.M.K. know the extent of its damages; it was sufficient that it knew on June 25, 2001, it had been damaged. *See Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279 (Tex.2004) ("even when the discovery rule applies, accrual occurs upon notice of injury, even if the claimant does not yet know the full extent of damages or the chances of avoiding them."). The statute of limitations therefore began to run on that date, unless otherwise modified by the *Hughes* tolling rule.

### 1. The Hughes Rule Does Not Apply to the Legal Malpractice Claims

■ In its third issue, J.M.K. contends that the *Hughes* rule tolls limitations "while the lawyer and client attempt to convince a municipality ... [to] reconsider its decision." [4]

■ When an attorney commits malpractice in the prosecution or defense of a claim that results in litigation, the statute of limitations on the malpractice claim against the attorney is tolled until all appeals on the underlying claim are exhausted or the litigation is otherwise finally concluded. *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 119 (Tex.2001). This is known as the *Hughes* rule. *See Hughes v. Mahaney & Higgins*, 821 S.W.2d 154, 156 (Tex. 1991).

---

4. J.M.K. additionally asks this court to hold that limitations are tolled "while the lawyer and client attempt to convince a municipality that the lawyer's representations were true."

No evidence has been advanced to demonstrate the existence, content, or veracity of Gregg's representations to a municipality. We therefore consider this argument waived.

J.M.K. invites this court to extend the *Hughes* rule to the present case, and asks us to conclude that the statute of limitations for legal malpractice claims is tolled while an attorney and his client attempt to persuade a municipality to "reconsider its decision." Specifically, in Karam's affidavit attached to its summary judgment response, J.M.K. contends:

> [If it] had asserted its malpractice claims against the Gregg Defendants immediately following the June 25, 2001 meeting, the basis of its claim would have been that the conversion from apartments to condominiums was not effective. During this same time period, [J.M.K.] was asserting to the City of Pasadena that the conversion *was* effective. The position that [J.M.K.] was advocating in the meetings with the City of Pasadena Planning and Zoning Commission was inconsistent with a claim that the conversion was not effective. [J.M.K.] did not file suit against [Gregg] following the June 25, 2001 meeting because it, assisted by Mr. Gregg and [other counsel], hoped that it could convince the City of Pasadena that the conversion had been properly done, and continued to advocate this position to the Commission.

J.M.K. correctly argues that *Hughes* was motivated in part by the desire to ameliorate the conflict that results "when a client is forced into adopting inherently inconsistent litigation postures in the underlying case and in the malpractice case." *Hughes*, 821 S.W.2d at 156. J.M.K. therefore asks us to apply the *Hughes* rule because J.M.K. was forced to adopt inher-

ently inconsistent positions in its negotiations with the City and in its claims against Gregg. J.M.K. argues that we should determine whether the *Hughes* rule applies on a case-by-case basis, and apply the rule where its use is justified for policy reasons.

This argument was presented to and rejected by the Texas Supreme Court in *Apex Towing*. As the Court noted, "clear and strict application of the *Hughes* tolling rule comports with our efforts to maintain a categorical approach when determining whether the discovery rule applies to certain types of claims." *Id.* at 122. The Court emphasized that, "without re-examining whether the policy reasons behind the tolling rule apply in each legal-malpractice case matching the *Hughes* paradigm, courts should simply apply the *Hughes* tolling rule to the category of legal-malpractice cases encompassed within its definition." *Id.* Following the bright-line approach set forth in *Apex Towing Co.*, we therefore limit our inquiry to determining whether the malpractice is alleged to have occurred "in the prosecution or defense of a claim that results in litigation."

■ Here, J.M.K. alleges that Gregg was hired to convert the apartment complex to condominiums and to ensure that the property was ready for sale. Regardless of whether J.M.K. was later forced to adopt inconsistent positions concerning the adequacy of Gregg's work, the services do not constitute "the prosecution or defense of a claim."[5] Because the work that

---

**5.** The "prosecution or defense of a claim" is not limited to legal services provided in connection with litigation. For example, in *Gulf Coast Investment Corp. v. Brown*, GCIC hired Brown to conduct a non-judicial foreclosure sale of real property owned by the Smiths. 821 S.W.2d 159, 160–61 (Tex.1991) (per cu-

riam). Brown allegedly failed to give the Smiths proper notice before conducting the sale. *Id.* The Smiths prevailed in a wrongful foreclosure suit against GCIC, and after the case concluded nearly two years later, GCIC filed a legal malpractice action against Brown. *Id.* In response, Brown asserted that

Gregg allegedly performed improperly does not constitute "the prosecution or defense of a claim," we conclude the *Hughes* tolling rule does not apply. Accordingly, we overrule J.M.K.'s third issue and hold that the statute of limitations on J.M.K.'s malpractice claims began to run on June 25, 2001, and expired two years later on June 25, 2003.

*2. A Claim Asserting a Third–Party Plaintiff's Independent Cause of Action Against a New Third–Party Defendant Is Not a "Cross Claim"*

■ J.M.K. filed its third-party petition against Gregg on September 2, 2003, more than two years after the Legal Malpractice Claims accrued on June 25, 2001. In J.M.K.'s second issue, it asserts the Legal Malpractice Claims are not barred by limitations because these third-party claims constitute a cross claim under section 16.069 of the Texas Civil Practice and Remedies Code.[6]

Section 16.069 provides:

(a) If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required.

(b) The counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required.

TEX. CIV. PRAC. & REM.CODE ANN. § 16.069 (Vernon 2002). The statute makes no mention of third-party practice, and by its express terms applies only to counterclaims and cross claims. Where the requirements of the statute are met, section 16.069 allows those who are already parties to the action to assert claims against one another that would otherwise be time-barred. However, section 16.069 does not address claims against nonparties. J.M.K. therefore relies on *Smith v. Lone Star Cadillac, Inc.*, 470 S.W.2d 791 (Tex.App.-Waco 1971, no writ) in an attempt to expand the definition of "counterclaim or cross claim" to include a third-party action.

In *Lone Star Cadillac*, the plaintiff sued the defendant Smith for damages from an automobile collision. *Lone Star Cadillac, Inc.*, 470 S.W.2d at 791. Smith then filed a third-party claim against Lone Star, alleging that it placed grease on his car's brake pedal, and that Lone Star was the proximate or sole cause of the collision and damages. *Id.* The trial court granted Lone Star summary judgment on the grounds that Smith's third-party action was barred by the statute of limitations. *Id.* at 792. The Tenth Court of Appeals reversed, holding that the third-party claim was a "cross claim" for the purposes of extending the statute of limitations under Article 5539c, the predecessor statute to section 16.069 (Vernon 2002). *Id.* at

---

CGIC's malpractice suit was now barred by limitations. The Texas Supreme concluded that Brown's alleged malpractice in conducting the non-judicial foreclosure sale occurred "in the prosecution of a claim that resulted in litigation." *Id.* The "claim" was the GCIC's debt claim against the Smiths' property, and Brown "prosecuted" the claim by conducting the foreclosure sale. The prosecution of the claim resulted in litigation when the Smiths filed a wrongful foreclosure action against GCIC. Because these facts met the requirements of the *Hughes* rule, the Court concluded that limitations governing GCIC's malpractice claims against Brown were tolled until the Smith suit (i.e., the resulting litigation) concluded. In contrast to *Brown*, J.M.K. did not have a "claim" that Gregg was hired "to prosecute or defend," whether inside or outside of a litigation context.

6. As noted above, Gregg does not assert that limitations bars the contribution and indemnity claims.

792. J.M.K. asks us to follow the reasoning of *Lone Star Cadillac* and hold the Legal Malpractice Claims against Gregg are not time-barred. We decline to do so.

We note first that *Lone Star Cadillac* is distinguishable on its facts. Unlike the present case, the *Lone Star Cadillac* defendant asserted a single claim that the third-party defendant was the cause "of the collision and damages." The opinion contains no indication that Smith suffered damages, and we cannot infer that the third-party petition sought recovery for Smith's damages, rather than contribution or indemnity for the plaintiff's damages.

■■■ This distinction is important for two reasons. First, a claim for indemnification or contribution does not accrue for limitations purposes until a plaintiff recovers damages or settles its suit against a defendant. *Goose Creek Consol. Indep. Sch. Dist. of Chambers and Harris Counties, Tex. v. Jarrar's Plumbing, Inc.*, 74 S.W.3d 486, 492 (Tex.App.-Texarkana 2002, pet. denied). Because limitations as to Smith's claim for contribution or indemnity had not run, it was unnecessary for the court to determine whether the savings statute applied. We therefore consider the court's interpretation of the word "cross claim" to be dicta. Second, because Smith only asserted Lone Star's liability for the plaintiff's damages, we do not read the case as authority for J.M.K.'s argument that section 16.069 should apply to revive claims for its *own* damages.

Even placing these considerations aside, we do not agree that section 16.069's use of the phrase "cross claim" encompasses a third-party petition. In reaching this definition, the *Lone Star* court relied on Texas Rules of Civil Procedure 38 and 97(f), and a page of a legal treatise. However, these sources do not support a conclusion that

Section 16.069 applies to claims asserted in a third-party petition.

Rule 38 allows a defendant to file an action "against a person not a party to the action who is or may be liable to him or to the plaintiff for all or part of the plaintiff's claim against the defendant." It does not support an expansive definition of the phrase "cross claim." Rule 38 notes that the third-party defendant may assert "counterclaims against the third-party plaintiff and cross-claims against other third-party defendants," following the definitions of a "third-party plaintiff" as a defendant who asserts a claim against a nonparty, a "counterclaim" as a claim made against one on the opposing side of the case, and a "cross claim" as a claim made against one on the same side of the case. It does not expand the definitions of these words, but distinguishes among them. Rule 97(f) likewise uses the terms counterclaim and cross claim in ways that exclude third-party claims.

*Lone Star* also cited to a page of Texas Jurisprudence without elaboration. The section found on that page states:

> The term "cross action" has in many instances been used variously to denote a cross proceeding against an opposite party, a coparty, a third party, or some combination of these parties. Thus the term has been defined as an independent suit, brought by defendant in a suit previously instituted against the plaintiff. Manifestly, the term as so used is synonymous with "counterclaim" under the Rules of Civil Procedure. The rules further provide for a "cross claim" against a coparty, and a "cross action" against a person not a party to the action.[7]

Interestingly, neither the treatise itself nor any of the cases on which it relied equate a

---

7. 52 Tᴇx. Jᴜʀ.2ᴅ, *Setoff, Counterclaim, & Cross* *Actions* § 4 (1964).

third-party cross *action* with a cross *claim*.[8] Even while broadly interpreting "cross action," the authors of the treatise continued to give the phrase "cross claim" a narrower reading, preserving the distinction between the terms.[9]

J.M.K. does not rest its argument solely on *Lone Star Cadillac* and the sources cited therein, but also points out similarities between section 16.069, which extends the time to file counterclaims and cross claims, with section 33.004, which permits the designation of responsible third parties under the proportionate responsibility laws. According to J.M.K., both sections give a defendant thirty days after its answer is due to assert claims that it is not solely responsible for the plaintiff's damages.

 Section 33.004 addresses joinder of responsible third parties. TEX. CIV. PRAC. & REM.CODE ANN. § 33.004 (Vernon 1997).[10] A responsible third party must be one who could have been, but was not, sued by the claimant, and must be potentially liable *to the plaintiff* for the damages claimed against the named defendant(s). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 33.011(6)(A)(ii) and (iii) (Vernon Supp. 2002). In other words, a defendant who designates a responsible third party pursuant to section 33.004 claims that the third party is responsible to the plaintiff, not to the defendant. The plaintiff's recovery

against the defendant is then reduced by the percentage of the responsible third party's fault.

 In contrast, section 16.069 addresses claims that arise "out of the same transaction or occurrence that is the basis of the action," and permits a party to file counterclaims or cross claims against other parties. The statute was intended to prevent a plaintiff from waiting until an adversary's valid claim arising from the same transaction was barred by limitations before asserting his own claim. *Hobbs Trailers v. J.T. Arnett Grain Co., Inc.*, 560 S.W.2d 85, 88–89 (Tex.1977). Simply stated, it prevents a party from delaying a claim for his own benefit. For that reason, the claims that may be asserted under this section are not limited to claims for contribution; the cross-claimant or counter-claimant may recover for his own damages from the other parties to the suit if his claims arose out of the same transaction or occurrence. This is true even if the cross-plaintiff or counter-plaintiff is not liable to the original plaintiff.

While a thirty-day time period is identified in both sections, the purposes of those sections are different. Section 33.004 provides a mechanism for a liable defendant to reduce the amount it is required to pay in compensation for the plaintiff's injuries; unlike section 16.069, it does not provide a

---

8. In fact, the section cites to *National Stock Yards National Bank v. Valentine*, 39 S.W.2d 907, 908 (Tex.Civ.App.-Amarillo 1931, no writ), which did not define the phrase "cross-action" as a synonym for a third party claim, but as a synonym for "counter-claim" ("[t]he law is settled in this state that a cross-action is an independent suit brought *by the defendant against the plaintiff*") (emphasis added).

9. J.M.K. quotes *Gavenda v. Strata Energy, Inc.*, in which the Court wrote, "we note that [defendants] have filed *a third-party cross-action* against the attorney [alleged to have committed malpractice]." 705 S.W.2d 690,

693 (Tex.1986) (emphasis added). We do not agree with J.M.K. that a "third-party cross action" is a "cross-claim" permitted by section 16.069. "Cross-claim" has a narrower meaning than "cross action," particularly in connection with statutes of limitations. *See* KIM J. ASKEW & J. ADELE HEDGES, 2 TEX. PRACTICE GUIDE: CIVIL PRETRIAL § 12:71 (Thompson/West 2005).

10. The present case was filed before the effective date of the most recent amendments to section 33.004.

means for a defendant's own recovery to be increased. Where a third party is found responsible, section 33.004 simply limits the defendant's liability. By its express terms, section 33.004 is concerned only with nonparties, while section 16.069 by its express terms is limited to parties.

We are not persuaded by the analogy drawn between limiting a defendant's liability to the amount of his own fault, and reviving a time-barred claim to permit the defendant to recover on a separate claim. Throughout the Civil Practices and Remedies Code, distinctions are drawn between the various types of pleadings and their effects. Where the legislature has intended third-party claims to be treated in the same manner as counterclaims and cross claims, it has not hesitated to say so.[11] We see no reason to disregard the plain meaning of the words of the statute. *See* Tex. Gov't Code Ann. § 311.011 (Vernon 2005). Moreover, the purpose of section 16.069 would not be served by rewriting it to allow a defendant to revive an expired claim against a non-party.

Because the assertion of these time-barred claims through a third-party petition does not fall within the language or the intent of section 16.069, we overrule appellant's second issue.

## B. Claim for Contribution and Indemnity

Under its first issue, J.M.K. asserts the trial court erred in granting summary judgment as to its contribution claim because Gregg owed a duty to BMW and Tyson to refrain from making misrepresentations. J.M.K. also argues the trial court erred in granting summary judgment on the indemnity claim because Gregg was J.M.K.'s agent when it made

the representations at issue, and because J.M.K. was vicariously liable for Gregg's representations.

In its second motion for summary judgment, Gregg argued that J.M.K. was not entitled to assert contribution or indemnity claims because such claims are merely derivative of the plaintiffs' right to recover, and the plaintiffs have no possible cause of action against Gregg. Specifically, Gregg argued that the plaintiffs have no viable cause of action against it on any claim of legal malpractice, and that an attorney owes a duty only to those in privity of contract with him. *See Dickey v. Jansen,* 731 S.W.2d 581, 582–83 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.). Gregg further claimed J.M.K. has no right of contribution based on negligent misrepresentation because no such claim was brought by plaintiffs against J.M.K. The only claim brought against J.M.K. was that of fraud in connection with a real estate transaction as defined in section 27.01 of the Business and Commerce Code. Additionally, Gregg argued J.M.K. has no valid indemnity claim against Gregg under Texas law. Finally, Gregg asserted in its summary-judgment reply brief that it has no liability to any of the parties in the case because there was no misrepresentation.

### 1. Claim for Contribution

A defendant's claim of contribution is derivative of the plaintiff's right to recover from the defendant against whom contribution is sought. *Varela v. Am. Petrofina Co. of Tex.,* 658 S.W.2d 561, 562 (Tex.1983). Thus, J.M.K.'s claim of contribution depends upon whether BMW or Tyson has the right to recover damages from Gregg. *See Shoemake v. Fogel, Ltd.,* 826 S.W.2d 933, 935 (Tex.1992). As the

---

11. *See, e.g.,* Tex. Civ. Prac. & Rem.Code Ann. §§ 9.001(1); 15.062(a); 31.008(h)(1); 33.011(1); 41.001(1); 42.001(1); 74.351(r)(4); 85.001(1); 86.001; 95.001(1); 147.001(2); 147.044(c) (Vernon 2005).

movant, Gregg bore the burden to establish that J.M.K. has no right to contribution as a matter of law.

Despite bearing the burden of proof, the only evidence Gregg produced in support of its motion is the affidavit of Dick Gregg, Jr., which recites only that the plaintiffs had never been Gregg's clients, nor had Gregg ever agreed to represent BMW or Tyson. This point is not disputed, nor does it affect J.M.K.'s ability to pursue contribution. Gregg similarly argues that, absent privity, BMW and Tyson cannot assert claims against it.

Gregg's position appears to be that it owes duties only to its clients, or to those in privity with its clients; however, both an individual and a law firm are capable of committing torts not encompassed in an attorney-client relationship, and can be held liable when they do so. For example, Gregg can be liable to a non-client for negligent misrepresentation:

> One who, in the course of his business, profession or employment, or in any transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*See McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests,* 991 S.W.2d 787, 791 (Tex.1999) (citing Restatement (Second) of Torts § 552). The Texas Supreme Court has held that attorneys can be liable to non-clients on exactly such grounds, and J.M.K has alleged such liability. *See id.*

In addition, both a principal and an agent can be held liable for their participation in tortious activity. *See Leyendecker & Assoc., Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984). If an agent is acting within the scope of his general authority, his wrongful act, though unauthorized, will nevertheless subject his principal to liability. *Walker Ins. Servs. v. Bottle Rock Power Corp.,* 108 S.W.3d 538, 554 (Tex.App.-Houston [14th Dist.] 2003, no pet.). Gregg does not contend it did not act as J.M.K.'s agent, nor does it claim any alleged representations made were outside the scope of its authority. The agency relationship between Gregg and J.M.K. is yet another basis on which contribution may be found.

BMW and Tyson claim J.M.K. made false representations regarding the truth and accuracy of the settlement statement, the contract of sale, and the warranty deed. Gregg has produced no evidence of Gregg's lack of involvement in the preparation of these documents or any representations regarding them. The absence of such evidence constitutes a further reason that Gregg has failed to prove J.M.K. can have no contribution claim against it.

In contrast, J.M.K. submitted the affidavit of Jerome Karam testifying, without objection, that he was a party to a conference call between Dick Gregg, Jr. and agents for BMW and Tyson, during which Gregg represented to BMW and Tyson that J.M.K. "had complied with all legal requirements to effect the conversion of the apartments in the Bryn Mawr Complex to condominiums, and that the closing could proceed." Karam further testified Gregg made the same representations to him, adding that the units "could be sold to and occupied by the third-party purchasers." Karam concludes, "When J.M.K. 6, Inc. represented to the Plaintiffs that the conversion had been properly done and that it had complied with all legal requirements in connection with this conversion, J.M.K. 6, Inc. merely relayed to the Plaintiffs what it had been told by its attorney, Mr. Gregg." For the purposes of review-

ing the summary judgment, we take Karam's statements as true. Even in the absence of this testimony, Gregg has failed to prove it is entitled to summary judgment on J.M.K.'s contribution claim.

Gregg argues that it cannot be held liable in contribution based on its alleged negligent misrepresentations because BMW and Tyson have not sued J.M.K. for negligent misrepresentation. Gregg cites no authority for the proposition that the plaintiff and the third-party plaintiff must recite the same claim for a contribution claim to be effective, nor have we found any such authority. Moreover, BMW and Tyson have sued J.M.K. for fraud in a real estate transaction. The elements of this claim include a false representation of a past or existing material fact, when the false representation is (a) made to a person for the purpose of inducing that person to enter into a contract; and (b) relied on by that person in entering into that contract. TEX. BUS. & COM.CODE ANN. § 27.01 (Vernon 2002). This claim has elements similar to negligent misrepresentation. *See id.* Gregg's contentions regarding an absence of common liability are accordingly without merit.

### 2. Claim for Indemnity

■ To a large extent, the arguments Gregg advances against J.M.K.'s claim for indemnity mirror those advanced and addressed regarding contribution. The only additional ground alleged is the bare assertion that "statutory, contractual, and common law indemnity are all inapplicable." Gregg acknowledges that common law indemnity applies in cases of vicarious liability, but asserts that this is not such a case.

■ This assertion is unsupported by evidence or authority. In determining a principal's vicarious liability, "the proper inquiry is whether the agent was acting within the scope of the agency relationship at the time of committing the act." *Celtic Life Ins. Co. v. Coats,* 885 S.W.2d 96, 99 (Tex.1994). Gregg has neither asserted nor attempted to prove that its alleged representations fell outside Gregg's role as J.M.K.'s agent or the scope of Gregg's authority. Although Gregg also states that no contractual indemnity applies, it produced no evidence to support that argument.

### 3. Gregg's Claim That No Misrepresentation Occurred

■ BMW, Tyson, Gregg and J.M.K. each assert that the City of Pasadena "has taken the position that no conversion to a condominium form of ownership ever occurred."[12] In its reply brief to J.M.K.'s response to the motion, Gregg asserted that no misrepresentation occurred because Gregg complied with governing state law to convert the apartments to condominiums, so that the City's failure to recognize the condominium conversion is simply unlawful.

■ This court cannot affirm the trial court's summary judgment on this ground because Gregg did not expressly assert it in its motion for summary judgment in the trial court. *See Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993) (holding appellate court cannot affirm trial

---

**12.** BMW and Tyson claim they "learned that the 'condominium units' each purchased were not, in fact, condominiums. Apparently, among other things, J.M.K. had failed to comply with the ordinances of the City of Pasadena, Texas requiring properties to be used as condominiums to receive prior approval from the City before their conversion." Similarly, J.M.K. alleges "that Gregg, on behalf of J.M.K., had failed to comply with various City of Pasadena ordinances, and the City refused to recognize the conversion to condominiums."

court's summary judgment on a ground not expressly stated in motion for summary judgment).

■ Even if we could consider this ground, it lacks merit. A general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached. *City of Richardson v. Responsible Dog Owners of Tex.*, 794 S.W.2d 17, 19 (Tex.1990). However, because none of the parties have identified the specific Pasadena ordinances at issue, we are unable to determine if Gregg complied with "all legal requirements in this regard," as asserted. In addition, Gregg's contention does not address the alleged misrepresentation that the properties "could be sold to and occupied by the third-party purchasers," nor does it address the misrepresentations alleged to be contained in the sales documents given to BMW and Tyson. In light of these unaddressed legal questions and the fact issues, Gregg has failed to satisfy its summary judgment burden to establish that J.M.K. has no valid claims for contribution and indemnity.

## VI. CONCLUSION

In sum, Gregg has established that J.M.K.'s Legal Malpractice Claims are time-barred.[13] Therefore, we affirm the first summary judgment rendered in favor of appellees on April 16, 2004. Because Gregg has failed to meet its burden to show that it is entitled to judgment as a matter of law on J.M.K.'s remaining claims for contribution and indemnity, we reverse the second summary judgment signed on July 8, 2004, and remand the case for

13. J.M.K. argues it will be unable to transfer liability for BMW and Tyson's injuries to Gregg if it is unable to assert its own claim for legal malpractice, but that is not the case. The claims stand or fall on their own merits.

further proceedings consistent with this opinion.

J.M.K.'s ability to pursue the Legal Malpractice Claims only affects its right to recover for its own damages, and does not affect its ability to argue that the same core facts render Gregg liable for BMW and Tyson's damages.