**Affirmed and Opinion filed July 20, 2017.**



In The

# Fourteenth Court of Appeals

___

## NO. 14-15-01031-CV

___

**HEATHER TENINI KUENTZ, INDIVIDUALLY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT MICHAEL KUENTZ, DECEASED, AND AS NEXT FRIEND OF B.M.K., A MINOR, LARRY MICHAEL "ROBERT" KUENTZ AND SANDRA KUENTZ, Appellants**

**V.**

**COLE SYSTEMS GROUP, INC. D/B/A THE COLE GROUP, Appellee**

___

**On Appeal from the 269th District Court
Harris County, Texas
Trial Court Cause No. 2013-45172**

___

### O P I N I O N

Three months after being rehired by a car dealership, a salesman shot and killed his sales manager at work. The appellants, the manager's family, sued the salesman, several dealership-related entities, and the appellee, an employment screening company that performed a pre-employment background check on the

salesman. The trial court granted the employment screening company's traditional and no-evidence summary judgment motion on the appellants' negligence claims. On appeal, the appellants contend that under the circumstances of this case, the company had a duty to exercise reasonable care in performing its background screening and to disclose what it actually knew about the salesman to the dealership. The appellants also contend that that they presented legally sufficient evidence that the company breached its duties and that its negligence proximately caused the sales manager's death. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2012, Robert Kuentz was working as a sales manager for Mac Haik Chevrolet, Ltd. at its car dealership on the Katy Freeway in Houston. Keith Grimmett worked there as a salesman. On November 30, 2012, one day after a confrontational sales meeting, Grimmett went to Kuentz's office, pulled out a gun, and shot him in the neck. Kuentz was taken to the hospital, where he died on December 3, 2012. Grimmett was later indicted and pleaded guilty to first degree murder. He is currently in prison serving a life sentence.

Cole Systems Group, Inc., d/b/a The Cole Group (Cole), is a pre-employment background screening company hired by Mac Haik to screen individuals applying for employment at the dealership. In exchange for an $85 fee, Cole would perform a set of services consisting of an interview of the applicant, a criminal records check of the counties in which the applicant lived and worked, a drug test, and a social security verification. Cole also provided a report summarizing the results of the screening to Mac Haik, but did not make hiring recommendations.

2

In 2006, Grimmett applied for a position as a car salesman at Mac Haik. Cole screened Grimmett at Mac Haik's request. Cole reported that Grimmett's drug test was negative and that no criminal records on Grimmett were located. Cole also reported an inconsistency in Grimmett's answers regarding the reason he left his job at Don Brown Chevrolet in 2005. Grimmett was hired, but he eventually left Mac Haik on good terms and was considered eligible for rehire.

After leaving Mac Haik, Grimmett moved to Missouri, where he worked at other car dealerships. In early 2012, Grimmett returned to Houston and applied for a sales job at Allen Samuels Chevrolet. Allen Samuels also used Cole's services and referred Grimmett to Cole for screening. Cole performed its standard services and provided Allen Samuels with a report of its findings. Allen Samuels hired Grimmett, but he quit after a short time.

In August 2012, Grimmett re-applied with Mac Haik for a sales job. After completing Mac Haik's rehiring process, Grimmett was again referred to Cole for screening. Cole reported that Grimmett's social security number had been verified, his drug test was negative, and there were no criminal records found in Harris County or in the two counties in Missouri where Grimmett had lived and worked. Cole also reported that certain answers Grimmett provided during his interview were inconsistent with information he had provided previously. Specifically, Cole reported that Grimmett: had been terminated from Mid Rivers Chrysler Jeep after he told the used car manager not to yell at him; had left his job at Don Brown Chevrolet under what he called a "mutual agreement" after a customer complained that he was unprofessional; and stated that his position at a jewelry store extended through August 2011 when it actually ended in June 2010.

Thus, contrary to the information Cole learned from Grimmett and reported to Mac Haik, Grimmett represented to Mac Haik in his employment application that he had never been fired from a job or asked to resign. Grimmett also misstated the duration of his employment with one employer, which masked an extended gap in his employment history. Terry Shields, the president of Mac Haik Automotive and the Mac Haik officer tasked with ultimate hiring authority for rehires like Grimmett, confirmed that providing false or misleading information in the application process was a ground for Mac Haik to deny or terminate employment. And, Susan Hensley, Mac Haik's director of human resources, testified without contradiction that it was Mac Haik's responsibility to verify the details of a potential employee's previous employment. Nevertheless, when questioned about the discrepancies identified in Cole's report, Shields stated that he was sure Mac Haik "didn't look quite as hard" at Grimmett's application because Grimmett had worked for Mac Haik before. Shields did not know if any managers or human resources personnel ever followed up on the information Cole provided, and there are no records showing that Mac Haik investigated Grimmett further. Nor did Mac Haik request any additional services from Cole.

To be employed as a car salesperson, Grimmett was required to be licensed by the City of Houston. To obtain a license, Grimmett was required to pass yet another criminal records search—this one performed by the Houston Police Department using the non-public Federal Bureau of Investigation database to locate "[a]ny offense involving violence to any person." Grimmett was issued a license.

4

Relying largely on Grimmett's positive employment history with the company, Mac Haik rehired Grimmett. Three months later, Grimmett killed Kuentz.

Appellant Heather Tenini Kuentz, Kuentz's widow, sued several Mac Haik entities and Cole for negligence and gross negligence on behalf of herself, Kuentz's estate, and their minor child. She also sued Grimmett for compensatory damages as a result of his conduct. Robert Kuentz's parents intervened in the lawsuit to assert their claims as wrongful death beneficiaries.

Following discovery, Cole and the Mac Haik entities moved for summary judgment. Cole filed a combined traditional and no-evidence summary judgment motion challenging each element of the appellants' negligence and gross negligence claims. First, Cole asserted that it owed no duty to Kuentz as a matter of law, whether generally or based on a negligent undertaking theory; there was no evidence that Cole breached any duty; and no evidence that Cole's actions proximately caused Kuentz's death.

The appellants filed a response in opposition, and both parties submitted substantial evidence in support of their respective positions. Cole also filed objections to several of Kuentz's exhibits, including the affidavits of Kuentz's experts. The trial court held a hearing and took the motions under advisement.

On November 4, 2015, the trial court signed a "Partial Judgment" in Cole's favor. By separate orders, the trial court partially granted and partially denied the motion filed by the Mac Haik entities, leaving the primary Mac Haik defendants in the case for trial.

Appellants and Mac Haik moved jointly to sever the claims against Cole and to abate the trial to facilitate appellate review of the summary judgment ruling. The

trial court denied the joint motion. The appellants then non-suited their claims against Mac Haik and Grimmett without prejudice, making the order granting summary judgment in favor of Cole final and appealable.

## II.    ISSUES ON APPEAL

To sustain their negligence claims, the appellants were required to present evidence that Cole violated a legal duty owed to Kuentz, a breach of that duty, and damages proximately caused by that breach. *See, e.g.*, *Nabors Drilling, U.S.A. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). The appellants challenge the trial court's ruling as to each of these elements of their claims.

In their first issue, the appellants argue that Cole owed a duty to exercise reasonable care in its screening of potential employees on behalf of Mac Haik based on two negligent undertaking theories, and a theory that Cole owed a duty to disclose what it actually knew about Grimmett. Because Cole owed no legal duty to undertake additional duties beyond those it specifically agreed to perform for Mac Haik, and there is no evidence that Cole negligently performed the duties it affirmatively agreed to undertake, we hold that the trial court did not err by granting summary judgment on the appellants' claim that Cole violated a legal duty owed to Kuentz, and do not reach the appellants' remaining issues.

### A.    Standard of Review

We review the trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). In reviewing either a traditional or a no-evidence summary judgment motion, we take as true all evidence favorable to the nonmovant and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Navy v. Coll. of the Mainland*, 407 S.W.3d 893, 898 (Tex. App.—Houston [14th Dist.] 2013, no pet.).

6

After an adequate time for discovery, a party without the burden of proof may, without presenting evidence, seek summary judgment on the ground that there is no evidence to support one or more essential elements of the nonmovant's claim or defense. Tex. R. Civ. P. 166a(i). A no-evidence motion for summary judgment must be granted if: (1) the moving party asserts that there is no evidence of one or more specified elements of a claim or defense on which the adverse party would have the burden of proof on at trial and (2) the respondent produces no summary judgment evidence raising a genuine issue of material fact on those elements. *Navy*, 407 S.W.3d at 898; *see* Tex. R. Civ. P. 166a(i). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *See Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007) (per curiam).

In a traditional motion for summary judgment, the movant bears the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). Once the movant produces sufficient evidence conclusively establishing its right to summary judgment, the burden of proof shifts to the nonmovant to present evidence sufficient to raise a fact issue. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). A defendant who conclusively negates at least one of the essential elements of a cause of action or conclusively establishes an affirmative defense is entitled to summary judgment. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

### B. The Negligent Undertaking Theories

Texas law generally imposes no duty to take action prevent to harm to others absent certain special relationships or circumstances. *Torrington Co. v. Stutzman*,

7

46 S.W.3d 829, 837 (Tex. 2000). Our courts have recognized, however, that a duty to use reasonable care may arise "when a person undertakes to provide services to another, either gratuitously or for compensation." *Id*.; *Fort Bend Cty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395 (Tex. 1991). The rule for liability to third persons based on a negligent undertaking theory is provided in Section 324A of the Restatement (Second) of Torts:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Sbrusch*, 818 S.W.2d at 395 (citing Restatement (Second) of Torts § 324A (1965)).

The existence of a legal duty is a question of law for the court. *Escoto*, 288 S.W.3d at 404; *Sbrusch*, 818 S.W.2d at 395. The critical inquiry concerning the duty element of a negligent undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (per curiam) (citing *Torrington*, 46 S.W.3d at 838–39)). In determining whether a defendant owes a duty, courts consider "several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the defendant's conduct, the magnitude of the burden of guarding against the injury, and the consequences

8

of placing the burden on the defendant." *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990).

Although Section 324A expands the class of person to whom the duty of care is owed, it does not expand the scope of the undertaking. *Lowe's Home Ctrs., Inc. v. GSW Marketing, Inc.*, 293 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Section 324A imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish. *Torrington*, 46 S.W.3d at 839 ("In *Sbrusch*, we observed that '[a] person's duty to exercise reasonable care in performing a voluntarily assumed undertaking is limited to that undertaking.'" (alteration in original) (citing *Sbrusch*, 818 S.W.2d at 397)); *Knife River Corp.-S. v. Hinojosa*, 438 S.W.3d 625, 634 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) (stating that "section 324A imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish"); *Lowe's*, 293 S.W.3d at 291 (same).

The appellants advance two negligent undertaking theories based on subsections (b) and (c) of Section 324A to support the imposition of a duty on Cole. First, the appellants argue that under the circumstances of this case, Cole undertook a duty owed by Mac Haik to exercise reasonable care in screening potential employees. Second, the appellants argue that Cole induced Mac Haik to rely on its undertaking. *See* Restatement (Second) of Torts § 324A(b), (c).[1] The appellants argue that the evidence presented supports a negligent undertaking claim against Cole under either theory.

---

[1] Cole argued below that none of its allegedly negligent omissions increased a risk of harm to Kuentz. *See* Restatement (Second) of Torts § 324A(a). On appeal, however, Kuentz does not contend that Cole is liable based on that subsection.

### 1. Cole conclusively demonstrated that it owed no duties beyond those it expressly agreed to perform for Mac Haik.

The appellants first posit that in exchange for substantial compensation, Cole undertook to perform the screening duty that Mac Haik owed to its other employees and thereby assumed the duty of reasonable care to refrain from a negligent investigation. The underlying premise for this argument is the employer's duty to exercise ordinary care to select careful and competent employees. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391–92 (Tex. 1997); *see also Watkins v. Basurto*, No. 14-10-00299-CV, 2011 WL 1414135, at *4 (Tex. App.—Houston [14th Dist.] Apr. 14, 2011, no pet.) (mem. op.) ("An employer has a general duty to control its employees, . . . and to adequately hire, train, and supervise employees to prevent injuries to third parties that are reasonably foreseeable."). The appellants argue that Cole undertook to perform a "thorough" screening of Grimmett and "Cole's own representations confirm its undertaking and its standard of care."

The appellants do not argue that car dealership employers generally owe a duty to perform a particular type of background screening on all potential salespeople or discuss the various factors generally considered when weighing the imposition of a legal duty; instead, the appellants maintain that by undertaking to perform a background screening for Mac Haik, Cole assumed a duty to refrain from a negligent investigation. The appellants argue that Cole's representations in soliciting Mac Haik's business and similar representations on Cole's website demonstrate that Cole promised to provide a broad, thorough screening designed to

prevent "potentially disastrous hires."[2] The appellants also point to correspondence with Mac Haik in which Cole represented that its "unique" interview and evaluation process was "designed to discover false and misleading information that [applicants] so often provide on your application and when they are interviewed at the dealership."[3] Among other things, Cole represented that it would uncover "any prior criminal arrest history . . . of violence, etc[.]" and "violent persons."[4]

The appellants contend that, despite these promises, Cole conducted a grossly inadequate background check. Specifically, the appellants argue that in accessing the Missouri courts database, Cole would have seen two entries

---

[2] For example, Cole's website touts that its industry-specific "Automobile Dealership Screening Program" is "Nationally Renowned" and "'the standard' for hiring better employees at hundreds of dealerships across the country located in 32 States." Cole represents that it can assist employers who are "wasting time and money by hiring and training employees who are "'here today and gone tomorrow,'" asking: "Why would you continue to hire people without knowing if they had 'problems' in their past?"

[3] In the correspondence, Cole explained that its background interview would "give potential employers so much more information":

> We determine where the applicant really worked, and the real reasons she or he left prior jobs. The background interview delves into issues such as jobs that were not listed on your application, detailed reasons the applicant left previous jobs, reasons terminated (fired) by previous employers, if he has ever disputed or appealed the reasons he was terminated (in order to qualify for unemployment benefits), reason why he has ever utilized attorneys, use of attorneys in disputes with employers, lawsuits and complaints against former employers, criminal history; substance abuse history; vehicular accidents, traffic citations and outstanding warrants for unpaid tickets, history of writing insufficient fund checks and resulting arrest warrants, etc[.]."

[4] Cole's correspondence explained that after the interview it would follow up with a criminal history check "using Courthouse Records Research instead of checking those **highly incomplete and inaccurate** so-called 'statewide' or 'national' databases." According to Cole, its more through "criminal history check" would uncover "any prior criminal arrest history" of "violence, etc[.]" In response to a 2010 inquiry by Mac Haik about Cole's prices, Cole stated: "In regards to price, one point to remember is, think of all of the lawsuit prone, workers comp prone, or theft prone individuals we have helped you avoid over the years[.] Not to mention violent persons or simply people driving up your turnover[.]"

reflecting "Protection Orders[s]" for "Adult Abuse w/o Stalking." Once Cole accessed these records, the appellants contend that Cole could have simply clicked on a "Docket Entries" tab and discovered an order of protection commanding Grimmett not to abuse, stalk, molest, or even communicate with his ex-wife. Had Cole then further investigated by calling the clerk's office in Missouri (as the appellants' investigator did), it would have discovered three more protective orders sought against Grimmett, detailing allegations by his ex-wife over several years that Grimmett had threatened to kill her, her children, and her parents; threatened to pour gasoline on her; called her repeatedly with threats of physical harm; and attempted to throw her from a third-floor balcony. The ex-wife also alleged that Grimmett suffered from an untreated mental illness and had three guns. According to the appellants, this information could have been obtained "at little cost."

The appellants also complain that Cole failed to adequately investigate Grimmett's employment history. For example, the appellants contend that if Cole had directly contacted Don Brown Chevrolet and obtained Grimmett's employment records, Cole would have learned that the real reason Grimmett left that company was that he was fired "for gross misconduct and violation of company policies & procedures" involving verbal sexual violence directed at a female customer. The appellants further assert that in previous screenings of Grimmett, Cole had uncovered conflicts with management and false representations on Grimmett's employment applications, but Cole failed to investigate this information or disclose Grimmett's lies.

Cole responds that the appellants' theory fails because the evidence conclusively proves that its duty does not extend beyond the specific services it performed for Mac Haik. In support of its contention, Cole points to testimony and

12

documentary evidence establishing that in exchange for an $85 fee, Cole performed four standardized services for Mac Haik: (1) a background interview to solicit self-disclosed employment-related historical information; (2) a criminal records check of public county records in the counties where the applicant lived and worked; (3) a drug test; and (4) a social security verification. Cole reported the results of its services to Mac Haik within one day. The report reflected the results of each of the four services provided. Thereafter, Cole had no further interaction with, or control over, the candidate. Nor did Cole make employment recommendations.

In 2010, Cole's Executive Vice-President Donald Cole met with Susan Hensley to review the scope of services Cole provided to numerous Mac Haik dealerships. During that meeting, Cole again explained that its searches pertain to publicly available criminal court records, not civil or family court records. Cole also informed Hensley that it could do civil litigation searches, but it would cost Mac Haik ten times as much as the standard services provided. Mac Haik never required or paid Cole to search civil or family court records.

Testimony from Mac Haik's witnesses confirms that the scope of Cole's services is uncontroverted. Susan Hensley, who created Mac Haik's hiring policies, testified that Mac Haik retained Cole to perform only the standard services. As Hensley stated, Mac Haik requested Cole to perform a criminal court record search because Mac Haik's hiring guidelines consider "only convictions and pending cases." Hensley understood that Cole's standard services did not include searching for civil or family court records.

Terry Shields agreed that Mac Haik used Cole's services only to identify "prison and drugs," which he clarified means convicted felons or drug users. As

13

Shields said, "I don't care if the guy is getting divorced or he forgot to pay his rent, but I do care if he's been to prison."[5] Shields confirmed that Mac Haik did not request or pay for Cole to search civil or family court records. Indeed, Shields acknowledged that it was not even Mac Haik's practice to assess civil or family records for hiring decisions.

Hensley's and Shields's testimony aligned with that of Rhonda Merritte,[6] the Mac Haik employee charged with reviewing Cole's report. Merritte said that Cole's services were limited to "a criminal background check, drug testing, Social Security verification, and an interview." Further, she understood that Cole reports public records to Mac Haik only "if there's a criminal record." As Merritte confirmed, she recommends the candidate for hire if there are no felonies and the drug test is negative. Merritte said that she would not expect Cole to report about civil or family court matters, including the existence of any "protective orders or restraining orders."

Similarly, it is undisputed that Cole's standard services for Mac Haik did not include contacting past employers or follow-up investigations of applicants' employment records. Rather, Cole simply asked the applicant a series of standard questions and reported the responses that were of interest to Mac Haik, such as prior terminations. It is uncontroverted that it was Mac Haik's responsibility to

---

[5] Shields testified that he "doubted" he looked at Cole's report before approving the decision to rehire Grimmett. As Shields testified, Mac Haik "didn't look quite as hard because he was a previous employee, left on good terms and a lot of guys liked the guy." As for Grimmett's prior work-related conflicts, Shields explained, "We never yelled at him and he never yelled at us when he worked for us previously."

[6] Merritte is identified as "Ronda" Merritte in the deposition transcripts, but is identified in briefing as "Rhonda," so for consistency we will do likewise.

investigate any negative information Cole reported and to verify the information candidates supplied on their employment application.[7]

Notwithstanding this undisputed evidence, the appellants appear to argue that Cole was required to: (1) search Missouri family court records for family-related protective orders issued at Grimmett's ex-spouse's request, obtain family court filings, and interview family court clerks to ascertain details of domestic allegations; (2) obtain employment records from Don Brown Chevrolet to discover additional details of a customer complaint that Cole reported (twice) to Mac Haik; and (3) report additional details about Grimmett's employment history, such as his decision to resign from prior positions over issues such as dissatisfaction with commissions and management.[8] The appellants' argument that Cole assumed these broad duties is unsupported by law or evidence.

When parties have specifically agreed to a standard scope of services, a party's promotional material or other general and broad descriptions cannot replace the actual undertaking. For example, in *Guillory v. Seaton*, the court rejected an injured worker's claim that general statements included in the worker's petition, including deposition excerpts, quoted promotional material, and other evidence,

---

[7] Whether Mac Haik's duty to exercise ordinary care to select careful and competent employees obligated it to conduct an investigation of Grimmett beyond the scope of services it hired Cole to perform, and whether Mac Haik breached the standard of care in rehiring Grimmett, are not questions before us in this appeal.

[8] For example, the appellants complain that Grimmett reported to Cole, but Cole did not include in its report, that the reason Grimmett left Allen Samuels Chevrolet was that he felt his commission was "shorted"; he left Johnny Londoff Chevrolet because his commission was cut by $3,000.00; and he left Roy Gate Chrysler Jeep because he "did not appreciate the [manager] taking out f[r]ustration on him" because a customer complained about the manager for not delivering a car as promised.

broadened the scope of services one company agreed to perform for another company, and dismissed the worker's negligent undertaking claim as lacking "any basis in law." *See* 470 S.W.3d 237, 241–42 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

Nor does the nature of Cole's business as a company that performs screening services expand the specific scope of services agreed on by Cole and Mac Haik. In *Banzhaf v. ADT Security Systems Southwest, Inc.*, the court rejected the plaintiffs' argument that ADT's status as a "security company" required ADT to perform additional services that its customer did not request. 28 S.W.3d 180, 184–85 (Tex. App.—Eastland 2000, pet. denied). The court concluded that the plaintiffs' duty argument, which was premised on their broad description of ADT's function as "the providing of security services," was "too broad." *Id.* As the court explained, "ADT is in the business of providing security services for both property and employees, but it provides those services only pursuant to contracts with its customers. The customer selects the services for which it will pay." *Id.*; *see also Mayer v. Willowbrook Plaza Ltd. P'ship*, 278 S.W.3d 901, 911–12 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding that security company owed no generalized tort duty to victim of third party criminal acts beyond the terms of its contract to provide security services).

Just as ADT's business as a "security company" did not impose a duty to provide security services beyond those which ADT agreed to provide to its customer, Cole's business as a pre-employment screening company does not impose a duty to provide screening services beyond those its customer, Mac Haik, hired Cole to provide. The appellants' position that Cole assumed broader duties because it is in the business of providing general assistance to dealerships in

screening potential employees ignores the evidence of the agreement between Cole and Mac Haik, as well as the testimony of Mac Haik's own witnesses, confirming the scope of the services Cole provided.

In support of their contention that Cole undertook Mac Haik's duty to perform background screening, the appellants cite to *Wise v. Complete Staffing Services*, 56 S.W.3d 900 (Tex. App.—Texarkana 2001, no pet.). In that case, Wise, a bakery employee, was attacked and severely injured by a temporary worker provided by Complete Staffing. *Id.* at 901. Wise claimed that Complete Staffing undertook but negligently performed the bakery's duty to investigate the temporary worker's background. *See id.* at 902. Significantly, the court of appeals held that neither the bakery nor Complete Staffing had a duty to check an employee's criminal history because that information was not directly related to the employee's competence or fitness for the duties of the job. *See id.* at 903. The court reversed a summary judgment in favor of Complete Staffing, however, concluding that a fact issue existed concerning whether Complete Staffing negligently performed the criminal background check it had undertaken when the parties disputed the scope of its services. *Id.* at 903–04.

The appellants argue that the *Wise* court recognized that Complete Staffing had a duty to perform a "thorough" background check as represented, and maintain that the case is "indistinguishable" from this case. But *Wise* does not hold, and we are aware of no other opinion holding, that a background screening company has a generalized tort duty to provide wide-ranging investigatory services, including searching civil and family court records, when there is no evidence it agreed to do so. For the same reason, the appellants' attempt to distinguish *Guillory*, *Banzhaf*, and *Mayer* on the grounds that the defendants' duties in those cases were

17

established by a written contract must fail. On this record, we conclude that the appellants have failed to present summary judgment evidence raising a genuine issue of material fact that Cole undertook a duty owed to Kuentz by Mac Haik beyond that expressly agreed to between the parties.[9] *See Torrington*, 46 S.W.3d at 839; *Knife River*, 438 S.W.3d at 634; *Lowe's*, 293 S.W.3d at 291.

### 2. Cole conclusively demonstrated that it owed no duty under Section 324A(c).

The appellants also argue that Cole owed Kuentz a duty under subsection (c) of Section 324A because Cole induced Mac Haik to rely on Cole's undertaking. This claim must also fail because, as discussed in the previous section, there is no evidence that Cole promised to perform any additional services for Mac Haik. Moreover, no evidence exists that Mac Haik ever relied on Cole for any additional services.

In support of their assertion that Mac Haik relied on Cole's representations, the appellants again point to statements in Cole's promotional materials and elsewhere touting the benefits of their services. The appellants also cite certain excerpts from the testimony of Mac Haik witnesses Hensley and Shields. For example, after being shown a copy of pages from Cole's website, Hensley agreed that Mac Haik relied on Cole to conduct background interviews of prospective employees. She also agreed that Mac Haik "expect[ed] that these background interviews would be the type of interview that they detail on their website" and

---

[9] As for the standard package of services Mac Haik asked and paid Cole to provide, there is no evidence that Mac Haik ever complained to Cole that it failed to conduct those services properly regarding Grimmett, and it is undisputed that Grimmett had no publicly available criminal records filed against him at the time Cole performed its search. The appellants' experts admitted that no publicly available records of criminal proceedings for any crime committed by Grimmett existed.

18

"would delve into the applicant's previous job history and the reasons for leaving those jobs or being fired." But Hensley also testified that she had "no idea" what was on Cole's website when she began using Cole's services, and merely "assumed" that Cole would report what it found out about an applicant. Hensley also emphasized several times during this exchange that Mac Haik was relying on Cole's ability to perform the criminal background searches.

The appellants also point to Shields's comment that he "assumed a background check was a background check because all I [was] ever told was background" and that he "assumed that if there was violence, criminal, anything major, that we would know." But these assumptions, expressed only in hindsight, do not expand the scope of Cole's services or establish reliance. Shields conceded that Mac Haik used Cole's services to identify convicted felons or drug users, not to find allegations in family court records, and that it was not Mac Haik's practice to assess civil or family court records for hiring decisions. Moreover, the face of Cole's report on Grimmett specifies that criminal court records, as opposed to civil or family, were searched.[10] And it is undisputed that Mac Haik never asked Cole to go back and investigate civil or family court records.

We conclude that the appellants' evidence does not raise a genuine issue of material fact that Mac Haik relied on Cole to undertake screening services other than the standard services that were included in the parties' agreement. *See*

---

[10] In their reply brief, the appellants point out that Cole's own internal data form concerning Grimmett's screening contained a checked box allowing Cole to search civil public records, which the appellants say Donald Cole "implausibly" testified was "an error." Grimmett also signed a release authorizing Cole to contact former employers, courts, law enforcement agencies, and other government record repositories. But, as discussed above, even though Cole could have provided additional services to Mac Haik, Mac Haik did not request or pay for any such services.

*Torrington*, 46 S.W.3d at 839; *Knife River*, 438 S.W.3d at 634; *Lowe's*, 293 S.W.3d at 291.

### C. The Theory that Cole Owed a Duty to Disclose Facts Within Its Actual Knowledge

The appellants also contend that regardless of whether Cole owed a duty to conduct a thorough investigation of Grimmett, at the very least it owed a duty to act reasonably with the information within its actual knowledge, citing *Golden Spread Council, Inc. v. Akins*, 926 S.W.2d 287 (Tex. 1996). Based on *Golden Spread*, the appellants assert that "Cole owed an independent duty to *disclose* and to *investigate further* once it had actual knowledge of facts suggesting that hiring Grimmett would pose an unreasonable risk of harm."[11] The appellants argue that because the evidence of what Cole actually knew about Grimmett and whether it sufficiently disclosed that information to Mac Haik is disputed, resolution of these disputed issues is a jury issue and an independent basis on which to reverse the summary judgment.

In *Golden Spread*, a parent sued the Boy Scouts of America (BSA) and the local scouting organization (GSC) for damages suffered by a boy who had been molested by a volunteer scoutmaster recommended by GSC. *Id.* at 288–89. The boy's allegations had been reported to GSC before it recommended the scoutmaster, Estes, to a church that was forming a new troop. *Id.* at 289. The supreme court imposed no duty on the BSA, which did not know about the

---

[11] In their reply brief, the appellants deny advocating that *Golden Spread* stands for the proposition that Cole owed a duty to disclose and investigate further, arguing that the case stands only for "the limited duty not to recommend individuals despite actual knowledge of a risk." Appellants did not make the latter argument in either the trial court or their opening brief. And in any event, it is undisputed that Cole did not make hiring recommendations.

20

allegations against Estes. *Id.* In considering whether GSC owed a duty, the court analyzed the various factors to be considered, including the importance of protecting children from abuse, and concluded that GSC owed a duty to the church, as well as to the children and parents involved in the new troop, who relied on GSC and those involved in selecting Estes "to provide a scoutmaster who was fit to serve." *Id.* at 291. The court explained that "GSC's affirmative act of recommending Estes as a potential scoutmaster to the church created a duty on the part of GSC to use reasonable care in light of the information it had received." *Id.*

Importantly, the supreme court imposed only a very limited duty on GSC: "[W]e hold that if GSC knew or should have known that Estes was peculiarly likely to molest boys, it had a duty not to recommend him as a scoutmaster. We impose no other duty on GSC than this." *Id.* at 292. The court further clarified that "GSC had no duty to investigate Estes on its own or to divulge to the church sponsor of [the new troop] or others the information it had received . . . . GSC's only duty was to exercise reasonable care, based on the information it received, in recommending scoutmasters." *Id.*

Based on *Golden Spread*, the appellants argue that that Cole had a duty to disclose and to investigate further once it had actual knowledge of facts suggesting that hiring Grimmett would pose an unreasonable risk of harm. The appellants posit that Cole knew about, but did not disclose to Mac Haik: (1) the two protective orders for adult abuse; (2) Grimmett's "clashes with management" that demonstrated his "violent disposition in the workplace"; and (2) Grimmett's lies on his screening application. At the very least, the appellants maintain, Cole had a duty to disclose to Mac Haik the information within its actual knowledge.

Initially, we note that the *Golden Spread* court imposed on GSC only a limited duty not to make a negligent affirmative hiring recommendation. *See id*. Here, Cole did not introduce Grimmett to Mac Haik or recommend his hiring. And nothing in Golden Spread imposes an affirmative duty to undertake additional investigation; indeed, the court specifically held that GSC "had no duty to investigate" the scoutmaster. *See id.*

As discussed above, the evidence conclusively demonstrates that Cole's duty was to inform Mac Haik of criminal public records as provided in their agreement. At the deposition of Jeremy Jalloway, the Cole employee who researched Grimmett's records, Jalloway was shown a 2015 Missouri Courts printout reflecting the entry of two protection orders for "FC [Family Court] Adult Abuse w/o Stalking" included among case listings for "Keith Grimmett." Jalloway acknowledged that he would have used that database, but testified that he could not recall seeing those entries in 2012. Further, Jalloway testified that he did not pull up or print out any information about family court cases. Jalloway explained that he only searched for criminal court records because "[w]e're only reporting criminal records."

Assuming that Jalloway actually saw the two family court entries, *Golden Spread* cannot be read to impose an additional duty on Cole to disclose the entries, because in that case, GSC negligently performed a duty it specifically undertook to perform at the request of the church. *See id.* at 289 (stating that GSC had the "responsibility of putting the church in contact with a potential scoutmaster"). It is undisputed that Cole correctly reported that Grimmett had no criminal convictions,

and Mac Haik never requested that Cole conduct any additional research on Grimmett.[12]

Next, the appellants claim that Cole failed to disclose its knowledge about "several instances of clashes with managers" that demonstrated Grimmett's "violent disposition in the workplace." In its interview notes, Cole documented Grimmett's disclosure that he resigned from two positions over commissions and one other position because a manager expressed frustration at him after a customer complained about the manager. Cole's notes do not reflect "clashes" or "violent tendencies." And Cole reported to Mac Haik the two instances in which Grimmett was either asked to leave his employment or terminated due to conflicts with management. Despite this information, Mac Haik determined that Grimmett was not disqualified from being rehired.

Finally, the appellants' claim that Cole had "actual knowledge" and should have reported that Grimmett "lied" about various details concerning his employment history is contradicted by the evidence. Testimony by both Cole and Mac Haik witnesses confirmed that Cole does not assess a candidate's honesty, credibility, or character, or have a duty to report that a candidate is a "liar." Cole did report to Mac Haik that Grimmett had been asked to leave or was terminated on two occasions as a result of conflicts with customers and managers, failed to account for gaps in employment, and gave answers inconsistent with information he had provided previously. As discussed above, Cole does not make hiring

---

[12] The appellants make no argument that a balancing of the interrelated factors to be considered when imposing a duty would compel the conclusion that a broad duty to "disclose known information" should be imposed on pre-employment screening companies like Cole for the protection of third parties. *See Golden Spread*, 926 S.W.2d at 289–92 (weighing the factors to be considered in determining whether to impose a duty). We therefore do not consider such an argument.

recommendations, and it was up to Mac Haik to determine whether Grimmett's misstatements concerning his employment history disqualified him from employment at Mac Haik based on its own guidelines.

On this record, we conclude that Cole established that it either did not owe or did not breach the duties appellants allege it owed, and the appellants raised no genuine issue of material fact precluding the trial court's summary judgment in Cole's favor.

## III.  CONCLUSION

We overrule the appellants' first issue and do not reach their remaining issues. We affirm the trial court's judgment.


/s/     Ken Wise
          Justice


Panel consists of Justices Boyce, Busby, and Wise.